**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ELIZABETH TOLEDO and** | ) | |
| **MARCO TOLEDO, Individually and as** | ) | |
| **Co-Independent Administrators of the** | ) | |
| **Estate of ADAM TOLEDO, Deceased,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 26 cv** |
| | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **The CITY OF CHICAGO, Illinois,** | ) | |
| **a Municipal Corporation and Chicago** | ) | |
| **Police Officer, ERIC STILLMAN** | ) | |
| **(#19277), Individually, and as Agent of** | ) | |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### COMPLAINT

Plaintiffs, **ELIZABETH TOLEDO** and **MARCO TOLEDO**, Individually and as

**Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, deceased, by and

through their attorneys, WEISSORTIZ, P.C., complain against **DEFENDANTS**, **CITY OF**

**CHICAGO and CHICAGO POLICE OFFICER, ERIC STILLMAN (#19277)**, Individually

and as agent of CITY OF CHICAGO, as follows:

### INTRODUCTION

1.     This action arises from the fatal shooting of thirteen-year-old Adam Toledo

("ADAM") by Chicago Police Officer Eric Stillman ("STILLMAN") during the early morning

hours of March 29, 2021, in Chicago, Illinois when STILLMAN violated a variety of Chicago

Police Department ("CPD") general and special orders, training bulletins, training protocol and

1

directives commencing from when he approached ADAM and engaged in a foot pursuit down an empty alley and fatally shot ADAM, who was unarmed and complied with STILLMAN's command.

2. ADAM was a child. He was thirteen years old, born on May 26, 2007 and would be 19 years of age today.

3. ADAM was not an adult suspect.

4. On March 29, 2021, ADAM was not advancing on STILLMAN.

5. He was not lunging at STILLMAN.

6. He was not chasing STILLMAN.

7. He was not threatening STILLMAN.

8. He was not pointing a firearm at STILLMAN.

9. He had stopped running, turned toward the officer, and raised his hands in response to STILLMAN's commands.

10. At that moment, deadly force was not necessary.

11. It was not proportional.

12. It was not a last resort.

13. It was not justified by an imminent threat of death or great bodily harm.

14. Nevertheless, Defendant STILLMAN fired one round into ADAM's chest.

15. ADAM collapsed backward and died from the gunshot wound.

2

16. This case does not involve a singular "split-second" decision made in isolation.

17. Rather, the conduct at issue consisted of a continuous and escalating series of acts and omissions beginning from the moment Defendant Stillman initiated contact with ADAM and continuing through the fatal shooting and its aftermath.

18. The totality of Defendant Stillman's conduct before, during, and after the shooting demonstrates deliberate and reckless actions and omissions extending far beyond any purported "split-second" judgment.

19. STILLMAN's fatal chain of choices led to ADAM's death.

20. STILLMAN chose to initiate and continue a foot pursuit.

21. He chose to separate from his partner.

22. He chose to pursue alone.

23. He chose not to call for backup.

24. He chose not to establish a perimeter.

25. He chose not to use containment.

26. He chose not to slow the encounter.

27. He chose not to use time as a tactic.

28. He chose to run with his firearm drawn.

29. STILLMAN chose tactics that accelerated and compressed the encounter rather than slowed or stabilized it.

3

30. He used a weapon-mounted strobe light with a child, closed distance rather than creating it, and failed to reassess when ADAM stopped and complied with commands.

31. Rather than allowing compliance to register and the threat assessment to change, STILLMAN fired.

32. Despite ADAM's compliance, STILLMAN chose to shoot.

33. STILLMAN's own sworn deposition admissions and sworn statement to the Civilian Office of Police Accountability confirm the preventability of the shooting.

34. He admitted that ADAM never pointed a gun at him.

35. He admitted ADAM never lunged at him.

36. He admitted ADAM never chased him.

37. He admitted ADAM said nothing to him before the shot.

38. He admitted he separated from his partner.

39. He admitted he did not request backup.

40. He admitted he did not call for a perimeter.

41. He admitted that time as a tactic means slowing things down.

42. He admitted that calling for a perimeter was an available alternative.

43. He admitted he could have chosen not to continue the foot chase.

44. He admitted that if he had not pursued, the shooting would not have occurred.

45. Those admissions destroy the defense narrative that this shooting was unavoidable.

46. It was avoidable.

47. It was foreseeable.

48. It was caused by STILLMAN's own escalation.

49. The City of Chicago ("CITY") is also liable because this shooting was the foreseeable result of municipal failures known to the CITY before ADAM was killed.

50. The CITY knew that foot pursuits are dangerous.

51. The CITY knew that officers must continuously reassess whether pursuit remains justified.

52. The CITY knew that time, distance, containment, perimeter, partner coordination, backup, and de-escalation prevent unnecessary force.

53. The CITY knew that deadly force may be used only as a last resort against an imminent threat.

54. The CITY knew that body-worn-camera compliance is essential to accountability and supervision.

55. The CITY knew all of this from its own policies, its own training, its own witnesses, its own records, and the federal Consent Decree under which it was operating.

56. The CITY also had officer-specific notice.

57. Before ADAM was killed, the CITY possessed pre-employment records showing STILLMAN's, including but not limited to:

a. intentional errors and omissions on his pre-employment hiring application which constituted hiring disqualification due to dishonesty per Administrative Special Order 14-01, Pre-Employment Disqualification Standards for Applicants for the Position of Police Officer, attached as **Exhibit O**,

b. disclosure of a reckless-driving charge which constituted hiring disqualification as set forth in Administrative Special Order 14-01, and

c. pre-employment medical questionnaire and application disclosing (post-traumatic) stress disorder, nervous breakdown, trouble concentrating, mental hospital admission, nervousness, excessive worry, trouble sleeping, trouble with memory, trouble concentrating, depression, crying spells, feeling of worthlessness, nightmares, hand tremors, tremors, concussion and more, which constituted unfitness for employment.

58. After hire and during employment CITY had further notice of employment related issues, including but not limited to:

a. repeated head injuries including another concussion and traumatic brain injury, which constituted further unfitness for continued employment,

b. prior use of force incidents, which constituted unfitness for continued employment,

c. tactical and training advisories which constituted unfitness for employment and

d. prior body-worn-camera failure to activate issues which constituted unfitness for employment.

59. The foregoing were not isolated facts.

60. They were cumulative warning signs.

61. The CITY nevertheless continued to arm and deploy STILLMAN in street policing without meaningful restriction, reassessment, discipline, monitoring, or corrective intervention.

62. ADAM's death was not the result of an isolated or unforeseen momentary event.

63. It was the foreseeable result of an officer who escalated rather than stabilized, and a municipality that knew the risks but repeatedly and on an ongoing basis failed to act.

## JURISDICTION, VENUE AND PRIOR ACTION

64. This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs assert claims arising under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

65. This Court has supplemental jurisdiction over Plaintiffs' Illinois state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Plaintiffs' federal claims.

66. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in Chicago, Cook County, Illinois, within the Northern District of Illinois.

67. Plaintiffs' state and federal claims arise from the same nucleus of operative facts surrounding the March 29, 2021, shooting and death of ADAM.

68. Plaintiffs timely commenced a prior action in the Circuit Court of Cook County on March 15, 2022, arising from the same shooting, same foot pursuit, same officer conduct, same municipal conduct, same injuries, same damages, and same death.

69. The prior action was actively litigated.

70. It was not nominally filed and abandoned.

7

71. It involved extensive written discovery, voluminous document production, motion practice, depositions, expert disclosures, and investigation into the same operative facts pleaded herein, including STILLMAN's admissions, hiring materials, training, use-of-force history, body-worn-camera compliance, injury history, stress-related disclosures, and the CITY's notice of those matters.

72. On April 17, 2026, Plaintiffs voluntarily dismissed the prior action pursuant to 735 ILCS 5/2-1009.

73. Plaintiffs refile this action within the time permitted by applicable law, including pursuant to 735 ILCS 5/13-217 and all applicable tolling, borrowing, savings-statute, and relation-back doctrines.

74. Defendants have had early, detailed, and continuous notice of the transaction, occurrence, factual record, witnesses, documents, and damages at issue.

75. Defendants cannot plausibly claim prejudice from federal counts grounded in the same shooting, the same conduct, and the same already-litigated factual record.

76. Defendants are not prejudiced by the inclusion of Plaintiff's federal constitutional and Monell claims in this action because the claims arise from the identical nucleus of operative facts that have been actively litigated by the parties for years in the Circuit Court of Cook County.

77. The underlying occurrence, witnesses, discovery, video evidence, departmental records, training materials, and policy issues have long been known to Defendants.

78. Indeed, CITY continued producing discovery through April 2, 2026, on the eve of trial, thereby demonstrating the continued active litigation and defense investigation of the precise facts and institutional conduct at issue herein.

79. Moreover, in March 2026, the CITY re-categorized Donald O'Neill from a lay witness to controlled expert in the field of hiring and training, thereby expressly placing municipal hiring, supervision, training, and departmental practices directly at issue.

80. As such, Defendants cannot credibly claim surprise or prejudice arising from Plaintiff's inclusion of federal constitutional and Monell theories predicated upon the same operative conduct, policies, practices, supervision, training, and customs already explored in discovery and expert disclosures.

81. Further, Plaintiff's claims under 42 U.S.C. § 1983 are independently timely pursuant to Illinois tolling principles incorporated into federal civil rights actions. Because the decedent was a minor at the time of death, Illinois' minority tolling statute, 735 ILCS 5/13-211, tolled survival-based constitutional claims belonging to the decedent.

82. Federal courts borrow both Illinois' statute of limitations and Illinois tolling provisions in § 1983 actions.

83. Accordingly, Plaintiff's survival-based constitutional claims, including claims supporting municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) remain timely.

84. Additionally, Plaintiff previously commenced a timely action arising from the same occurrence in Illinois state court and voluntarily dismissed that action pursuant to 735 ILCS 5/2-1009.

85. Plaintiff thereafter re-filed this action within the time permitted by 735 ILCS 5/13-217.

86. The present claims arise from the same operative facts, identical occurrence, and same core conduct previously placed at issue.

87. Defendants have therefore long possessed notice of the factual basis underlying the claims asserted herein, including allegations concerning Chicago Police Department practices, training, supervision, foot pursuit conduct, use-of-force practices, and institutional failures.

88. The present pleading merely expands upon those already-litigated factual allegations through corresponding federal constitutional theories.

89. To the extent Defendants contend that Plaintiff's Monell allegations constitute "new" claims, such contention fails because the CITY has long been on notice that Plaintiff challenges institutional customs, training deficiencies, supervisory failures, and departmental practices arising from the incident at issue.

90. Defendants have actively defended those issues through written discovery, expert disclosures, motion practice, and trial preparation.

91. Under these circumstances, the City cannot establish unfair surprise or prejudice sufficient to bar adjudication of Plaintiff's federal claims on the merits.

## **PARTIES**

92. Prior to his death, ADAM was a resident of Chicago, Cook County, Illinois.

93. This suit is brought by ADAM's parents, Elizabeth Toledo and Marco Toledo, individually and as the Co-Independent Administrators of the Estate of ADAM ("Plaintiffs"). Elizabeth Toledo and Marco Toledo are residents of Chicago, Cook County, Illinois.

94. Defendant CITY is an Illinois municipal corporation that operates the Chicago Police Department.

95. At all relevant times, CPD was the CITY's law enforcement agency and acted through sworn officers, supervisors, command staff, policymakers, investigators, trainers, and agents.

96. Defendant STILLMAN was, at all relevant times, a sworn Chicago Police Officer employed by the CITY.

97. At all relevant times, STILLMAN acted under color of state law.

98. At all relevant times, STILLMAN acted within the course and scope of his employment as a Chicago Police Officer.

## FACTUAL ALLEGATIONS

99. On January 31, 2019, the State of Illinois and the CITY entered into a comprehensive Consent Decree requiring sweeping reforms to the policies, practices, training, supervision, and accountability systems of the Chicago Police Department ("CPD"). The Consent Decree is attached hereto as **Exhibit A**. The Consent Decree is mentioned herein for context and backdrop.

100. The Consent Decree was entered in federal court following years of public concern, investigative findings, and documented incidents involving unconstitutional policing

11

practices, including excessive force, discriminatory policing, deficient training, and inadequate accountability mechanisms within CPD.

101. On the morning ADAM was shot and killed, CPD was not in compliance with following paragraphs of the Consent Decree: 125, 154, 156, 158, 159, 160, 161, 162, 163, 164, 165, 166, 170, 171, 177, 178, 179, 182, 183, 184, 186, 187, 198, 199, 200, 201, 202, 203, 204, 205, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, and 244, among others. The Consent Decree violations are attached hereto collectively as a chart as **Exhibit B**. If compliance was had, ADAM death would have been prevented. For example, paragraph 162 mandated that CPD Officers will allow individuals to voluntarily comply with lawful ordered whenever safe and feasible.

102. The Consent Decree required CPD to implement and enforce policies concerning sanctity of life, de-escalation, necessity, proportionality, continual reassessment, accountability, supervision, and training.

103. The Consent Decree further required CPD to ensure that officers utilize de-escalation techniques, including time as a tactic, tactical positioning, warnings, and reasonable opportunities for compliance when safe and feasible.

104. The Consent Decree further required CPD to restrict the use of deadly force to circumstances involving an imminent threat of death or great bodily harm.

105. The Consent Decree further required CPD to train, supervise, and hold officers accountable for use-of-force decisions.

106. Before ADAM was killed, independent monitoring reports reflected that CPD remained not in full compliance, under assessment, or otherwise deficient in provisions directly related to the circumstances of this shooting[1].

107. Those deficient or noncompliant areas included use of force, de-escalation, warnings before force, deadly-force restrictions, supervision, training, and accountability.

108. CITY therefore had actual notice that written policies alone were insufficient.

109. CITY knew that unless those policies were meaningfully enforced through training, supervision, discipline, review, corrective action, and accountability, officers would continue to violate the principles designed to prevent unconstitutional force.

110. CITY failed to correct those deficiencies before ADAM was killed.

111. CITY further knew that deficient training and supervision concerning interactions with minors and youth created foreseeable risks of unconstitutional force during rapidly evolving encounters and foot pursuits involving children and adolescents.

112. CITY failed to correct those deficiencies before ADAM was killed.

113. CITY's failure was not abstract. It materialized in the conduct of Defendant STILLMAN, who violated the precise principles the Consent Decree required the CITY to implement and enforce, including de-escalation, continual reassessment, tactical restraint, force mitigation, warnings, time as a tactic, and developmentally appropriate policing of a thirteen-year-old child.

---

[1] *See* https://live-chicago-imt.pantheonsite.io/wp-content/uploads/2024/09/2021_03_30-Independent-Monitoring-Report-3-amended-filed.pdf

114. The Consent Decree and accompanying monitoring process placed the CITY on continuing and repeated notice that deficiencies in training, supervision, accountability, de-escalation, youth interactions, force mitigation, tactical decision-making, and use-of-force practices remained unresolved before the shooting of ADAM.

115. CITY therefore knew that officers who failed to utilize de-escalation, continual reassessment, tactical restraint, containment, communication, warnings, time as a tactic, and age-appropriate policing strategies created foreseeable risks of unnecessary and unconstitutional force during rapidly evolving encounters and foot pursuits involving minors.

116. CITY's failures were not limited to isolated mistakes by individual officers. Rather, those failures reflected broader customs, practices, tolerances, and systemic deficiencies that allowed unconstitutional force and escalating tactics to occur without meaningful intervention or correction.

117. The fatal shooting of thirteen-year-old ADAM occurred against that backdrop of known and unresolved deficiencies.

I. **THE HIRING OF ERIC STILLMAN: APPLICATION MISREPERSENTATION, HIRING DISQUALIFICATIONS, VA DISABILITY, HAND TREMORS, STRESS-RELATED DISCLOSURES, MEDICAL FITNESS DISCLOSURES**

**A. Application Misrepresentation, Hiring Disqualifications & Inconclusive Polygraph Results**

118. Before hiring STILLMAN, the CITY possessed application and background materials reflecting red flags requiring closer scrutiny.

119. STILLMAN's personal history materials reflected omissions and inconsistencies.

120.    Kentech, a Chicago based background screening and investigative technology company, utilized by the CITY to determine honesty on the application, flagged multiple questions including STILLMAN's failure to accurately disclose his Marine Corps Reserve service.

121.    Kentech also flagged that STILLMAN incorrectly denied that he had been charged with reckless driving.

122.    STILLMAN had, in fact, been charged with reckless driving on or about August 20, 2007.

123.    CITY's hiring expert witness Donald O'Neill ("O'Neill") testified that honesty was important in the hiring process.

124.    O'Neill testified that dishonesty could be a basis for disqualification.

125.    O'Neill testified that the administrative special order governing pre-employment disqualification standards laid out what would disqualify a candidate, what could disqualify a candidate, and what levels of discretion applied.

126.    O'Neill testified that he reviewed hiring packets and made determinations concerning whether candidates were eligible to be hired or recommended for hire.

127.    Christopher Pettis ("Pettis"), CITY's hiring expert witness, acknowledged that investigators are supposed to note inconsistencies and red flags in the file.

128.    Pettis acknowledged that the hiring process expects truthful answers from applicants.

129. Further, STILLMAN's pre-employment polygraph examination deemed the following questions inconclusive: have you ever committed a crime and are you withholding any information about your involvement with illegal drugs.

130. Despite those red flags, CITY hired STILLMAN, a) armed him, b) authorized him to seize members of the public, and c) deployed him into situations requiring actions under stress.

131. CITY's hiring failure matters because police officers are not ordinary employees.

132. CITY was not hiring someone for a position without public-safety consequences.

133. It was hiring an armed officer with authority to detain, pursue, seize, and use deadly force.

134. Honesty, judgment, threat perception, emotional control, fitness and compliance with rules were essential to the position.

135. CITY's decision to hire STILLMAN despite these red flags began the chain of municipal failure that culminated in ADAM's death.

### B. Stress V.A. Disability Disclosure, Hand Tremors, and Prior Concussions

136. STILLMAN disclosed disability-related information in his application materials, including stress-related disability and physical conditions.

137. STILLMAN's disclosed a military-service disability rating of 30%, as evidenced in his CPD application, submitted on February 14, 2015, which was severe enough that the V.A. assigned a ten (10) percent permanent disability rating to STILLMAN for his mental health

diagnosis of "stress", a ten (10) percent permanent disability rating to STILLMAN for "back" and a ten (10) percent permanent disability rating to STILLMAN for scars.

138.   A V.A. disability rating is "based" upon doctors' reports and medical results supplied by the applicant, the results of the applicant's V.A. claim exam, and any other information provided by different sources, such as federal agencies2.

139.   According to the Schedule of Ratings, Schedule of Ratings, 38 CFR § 4.130, a thirty (30) percent rating is assigned when there is:

> Occupational and social impairment due to mild or transient symptoms which **decrease work efficiency** and ability to perform occupational tasks only **during periods of significant stress**, or symptoms controlled by continuous medication.

*See* 38 CFR § 4.130 (emphasis added).

140.    However, pursuant to federal regulation, Title 38 Section 4.130 and  VA/DoD Clinical Practice Guideline for Management of Posttraumatic Stress 2010 - Version 2.0, October 2010, the only long-term Veterans Administration stress disability is post-traumatic stress disorder, and not simply a "stress" disability as Stillman disclosed on his pre-hire CPD application.

141.   CITY also armed STILLMAN with a service weapon, despite knowing that he disclosed hand tremors in his pre-hire health appraisal:

---

[2] *See* U.S. Dept. of Veterans Affairs, "About V.A. disability ratings," (2022), https://www.va.gov/disability/about-disability-ratings

HEART MURMUR - SKIPS A BEAT WITH NO PROBLEMS ATTACHED

BACK INJURY - MID BACK PAIN

TREMORS — HANDS HAVE SHAKEN ⬤ ⬤

142. The CITY failed to respond reasonably and constitutionally to the totality of information in its possession, including application red flags, hiring disqualifications, hand tremors and V.A. disability.

143. STILLMAN's stress-related disclosure was material because police service requires psychological stability, emotional regulation, judgment under stress, threat discrimination, and disciplined use-of-force decision-making.

144. CPD's own rules and regulations recognized that constant stress is inherent in police service. CPD's Rules and Regulations are attached hereto as **Exhibit C.**

145. CPD's own rules and regulations recognized that psychological and emotional stability must be assured. *Id.*

146. Pettis acknowledged that CPD rules recognize the importance of psychological and emotional stability in police service.

147. Pettis acknowledged that testing techniques must be available and utilized on a continuing basis to identify members who become unsuitable during their tenure.

148. Pettis further acknowledged that nothing in that language prevented continuing psychological testing when appropriate.

149. O'Neill testified that fitness-for-duty and behavioral-intervention mechanisms existed to address concerning conduct, performance changes, or erratic behavior.

18

150. CITY failed to respond reasonably and constitutionally to the totality of information in its possession, including application red flags, stress-related disclosure, medical unfitness, force incidents, tactical advisories, body-worn-camera compliance issues, injury history, and duty-related absences.

151. CITY's failure was not one isolated missed opportunity. It was a continuing failure to use available screening, monitoring, supervisory, behavioral-intervention, and fitness-for-duty mechanisms despite accumulating warning signs that STILLMAN required closer scrutiny before hire and after hire for continued armed field deployment.

152. CITY knew that head trauma, neurological injury, stress-related conditions, hand tremors and medical instability, and emotional impairment were materially relevant to an armed police officer's judgment, threat assessment, emotional regulation, impulse control and tactical decision making.

### C. Stillman's Pre-Employment Health Appraisal Questionnaire

153. In April 2015, STILLMAN completed and submitted a pre-employment health appraisal questionnaire to CITY as part of the CPD's hiring, fitness, and suitability determination process for armed law-enforcement review.

154. Within this questionnaire, Defendant STILLMAN disclosed that he had or has a history of concussion, nervous breakdowns, nervousness, excessive worry, trouble sleeping, trouble with memory, mental disorder(s), suicide, trouble concentrating, depression, crying spells, feelings of worthlessness, nightmares, hospitalization at a mental institution and neurological symptomology relevant to CPD's evaluation of his fitness for police service and ability to safely exercise police powers. *Scott v. Edinburg*, 101 F. Supp. 2d 1017 (N.D. Ill. 2000).

155. CITY, acting through its agents responsible for hiring, screening, retention, supervision, training, medical review, and fitness determinations, had actual and/or constructive notice of information requiring further inquiry, evaluation, monitoring, investigation, follow-up, restrictions, supervision, or intervention before entrusting Defendant STILLMAN with the authority, discretion, firearms, and police powers of a sworn Chicago Police Officer.

156. Plaintiff further alleges that the CITY of Chicago's pre-employment hiring, screening, supervising and retention systems were inadequate, deficient, deliberately indifferent, and/or negligently administered insofar as the CITY approved, retained, and empowered STILLMAN despite information known or available to the CITY concerning behavioral, neurological, emotional, stress-related, psychological, medical or physiological concerns bearing upon officer judgment, impulse control, threat assessment, emotional regulation, decision-making under stress, use-of-force risk, and/or fitness for armed patrol duties.

157. Plaintiff further alleges that these allegations are asserted solely for purposes of municipal liability, negligent hiring, negligent retention, negligent supervision, Monell liability, notice, foreseeability, ratification, causation, deliberate indifference, and the CITY's knowledge and conduct, and are not asserted for any improper purpose, character attack, stigma-based inference against Defendant STILLMAN.

158. Plaintiff further alleges that the referenced materials were created, maintained, reviewed, and/or utilized by the CITY and CPD in connection with employment suitability and hiring determinations, municipal notice, foreseeability, negligent hiring, supervision and retention, deliberate indifference, related federal and supplemental state-law claims, and employer fitness evaluations in federal civil-rights litigation.

20

159. To the extent that Defendants contend that any portion of such materials is protected from disclosure or use under state-law confidentiality doctrines, Plaintiff expressly alleges that any reference to such information is based upon records and information already produced and reviewed in prior litigation proceedings, is made in good faith after reasonable investigation, and is included only to the extent necessary to plead municipal notice.

160. Following the shooting of ADAM, STILLMAN sought and obtained disability-related benefits through the Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago. Thereafter, in additional and subsequent administrative review proceedings before the Circuit Court of Cook County in or about 2024, STILLMAN sought and obtained an increased disability award (from 50% to 75%) based upon his contention that he had PTSD only after killing ADAM, not before, despite his pre-hire health disclosures and VA disability.

## II. ERIC STILLMAN ON THE JOB: PRIOR USE OF FORCE INCIDENTS, BODY-WORN-CAMERA FAILURES, HEAD INJURIES AND NOTICE TO THE CITY

### A. Prior Use of Force Incidents & Body-Worn-Camera Failures

161. Before March 29, 2021, the CITY possessed and controlled records showing that STILLMAN had been involved in multiple force-related incidents that generated internal review, advisements, debriefing points, and training-related concerns.

### First Use of Force Incident

162. On or about November 25, 2016, STILLMAN was involved in a force incident whereby STILLMAN preformed a takedown of subject.

### Second Use of Force

21

163. On or about July 28, 2017, STILLMAN was involved in a force incident whereby STILLMAN used a takedown to arrest subject.

### Third Use of Force Incident

164. On or about December 4, 2017, STILLMAN was involved in a force incident whereby STILLMAN grabbed subjects hand and pulled subject out of the vehicle.

### Fourth Use of Force Incident

165. On or about January 24, 2018, STILLMAN was involved in a force incident.

166. STILLMAN struck subject with a close hand three times during an arrest attempt. After subject resisted STILLMAN again struck the subject three more times. STILLMAN then delivered one strike to subjects left leg with his baton.

167. When subject attempted to move out of STILLMAN's grip, STILLMAN wrapped his baton around subject's abdomen area. STILLMAN then preformed a takedown on subject.

168. The force-review materials advised that STILLMAN failed to properly activate his body-worn camera resulting in admonishment.

### Fifth Use of Force Incident

169. On or about December 27, 2018, STILLMAN was involved in a force incident whereby STILLMAN struck subject with multiple open hand strikes to the side of the subject's head.

170. The force-review materials advised that STILLMAN failed to properly utilize his body-worn camera.

### Sixth Use of Force Incident

171. On or about February 5, 2019, STILLMAN was involved in a force incident in which he reported that a subject refused to exit a vehicle, reached toward his waistband, and caused STILLMAN to believe the subject was armed.

172. STILLMAN then grabbed the subject's hand, pulled him from the vehicle, and used an open-hand strike.

173. The force-review materials advised officers not to place themselves in an unsound tactical position.

174. That advisory was directly relevant to ADAM's shooting because the fatal encounter likewise involved STILLMAN creating danger, including separating from his partner, pursuing ADAM alone, drawing his firearm while running, closing distance, failing to use containment, and then relying on the danger he created by those choices to justify deadly force.

### Seventh Use of Force Incident

175. On or about May 14, 2019, STILLMAN was involved in a force incident in which STILLMAN held the subjects legs while attempting to put the subject in custody.

### Eighth Use of Force Incident

23

176. On or about June 23, 2020, STILLMAN used force during the detention or arrest of Loren Austin, including pulling Austin's hands toward the center of his back and performing a wristlock after Austin stiffened and pulled away.

177. Internal review materials recommended that STILLMAN review Special Order S03-14 because of late activation of his body-worn camera, similar to his late activation in ADAM's shooting.

### Ninth Use of Force Incident

178. On or about July 5, 2020, STILLMAN conducted a takedown of the subject through grabbing their arm and hand cuffing the subject.

### Tenth Use of Force Incident

179. On or about January 5, 2021, STILLMAN again used force, including an open-hand strike and takedown, to handcuff a subject.

180. The force-review materials again recommended that STILLMAN review Special Order S03-14 because of late activation of his body-worn camera, similar to his late activation in ADAM's shooting.

181. These records were significant because they did not merely document isolated events.

182. They placed the CITY on actual notice of recurring problems in the same categories implicated by ADAM's death: tactical decision-making, escalation, force, accountability, and body-worn-camera compliance.

183. Body-worn-camera compliance is not a technicality. It is central to constitutional policing because it allows supervisors, investigators, courts, juries, and the public to know what happened.

184. It deters misconduct, promotes accountability, protects the public, and protects officers who act lawfully.

185. Repeated body-worn-camera failures by an officer such as STILLMAN who later shoots a child such as ADAM are not paperwork mistakes; they are warning signs.

186. Tactical advisories are also not paperwork.

187. They warn that officer choices can create danger.

188. They identify the very risk at issue here: an officer making tactical decisions that place himself in danger and then using that danger to justify force.

## B. On the Job Head Injuries

189. Before March 29, 2021, CITY possessed records reflecting that STILLMAN had sustained multiple injuries and duty-related absences, including injured-on-duty episodes and extended medical leave.

190. Those records included documented complaints and treatment involving physical trauma, including head, knee and elbow injuries, as well as headaches and concussion-related or head-injury concerns implicating functioning and fitness for duty.

### First on the Job Head Injury

191. On July 28, 2017, STILLMAN struck the top of his head causing an open bleeding wound with swelling.

### Second on the Job Head Injury

192. On November 16, 2017, STILLMAN fell from the top of a fence onto his back.

### Third on the Job Head Injury

192. On January 25, 2018, STILLMAN was injured while attempting to arrest an assailant. STILLMAN sustained an injury to his head, face and mouth. STILLMAN was then treated for a closed head injury.

### Fourth on the Job Head Injury

193. On May 14, 2019, STILLMAN sustained kicks to the back and back of the head while STILLMAN attempted to put an offender into rear of the vehicle. This injury required immediate emergency services. STILLMAN was treated for a concussion and post-traumatic headache.

194. Such records were material because armed policing demands reliable perception, reaction control, emotional regulation, physical coordination, cognitive processing, threat discrimination, and judgment under stress—capacities that can be compromised by repeated trauma and untreated injury.

195. When considered together with STILLMAN's pre-hire stress-related disclosures, time-limited suitability determination, prior force incidents, tactical advisories, and repeated body-worn-camera compliance issues, these injury and absence records required meaningful review, escalation, and intervention.

196.    Instead, there was only passive retention of STILLMAN.

### C. City's Notice

197.    CITY failed to meaningfully evaluate the combined significance of these risk indicators or to use its own available systems for intervention, including fitness-for-duty review, behavioral intervention, neurological or psychological follow-up, supervisory monitoring, or field restrictions.

198.    The warning signs were in CITY's files; the response was not.

199.    The question was not whether any single event required termination.

200.    The question was whether the totality of known facts—stress disclosures, force incidents, tactical concerns, accountability failures, injuries, and absences—required CITY to act before continuing to deploy STILLMAN with a firearm in public encounters.

201.    Despite this notice, CITY continued to retain and deploy STILLMAN in armed street policing without meaningful discipline, restriction, retraining, corrective intervention, reassessment of fitness, or monitoring commensurate with the risk.

202.    CITY's response communicated that force incidents, tactical concerns, body-worn-camera violations, and escalating warning signs would generate documentation, but not meaningful accountability.

203.    The CITY failed to intervene.

204.    What its own records showed was not an isolated issue, but a pattern.

205.    A pattern that made the risk foreseeable and the eventual harm preventable.

206.    That municipal tolerance was a moving force behind ADAM's death.

**III.    THE FATAL ENCOUNTER: STILLMAN CREATED AND ESCALATED THE RISK**

207.    On March 29, 2021, at 2:35 a.m., ADAM was walking near the 2400 block of South Sawyer Avenue in Chicago with Ruben Roman ("Roman"), a twenty-one-year-old man.

208.    At 2:36:14 a.m., ShotSpotter, a city mounted transmitter which conducts audio surveillance, allegedly reported eight (8) gun shots in the vicinity.

209.    The Special Order titled "ShotSpotter Flex Program", S03-19, dated July 5, 2017, and attached hereto as **Exhibit D**, states in part:

> Notify OEMC when responding to the scene of a ShotSpotter related incident. Take a safe and strategic approach while responding to the incident, being aware that an offender or multiple offenders may be on scene. Follow the procedures in the Department directive entitled "Preliminary Investigations". Request additional field units for assistance as needed. Canvass the precise location identified via the ShotSpotter system for victims, evidence, and witnesses. Notify the SDSC if they are aware of any deficiencies in ShotSpotter data or alerts. If completing a case report, document if the incident is ShotSpotter related for follow-up investigators.

   a.   However, at 2:36:14 a.m. STILLMAN failed to notify OEMC when he responded to the alleged ShotSpotter alert, in violation of Special Order S03-19.

210.    The General Order titled "Radio Communications", G03-01-01, dated July 13, 2016, attached hereto as **Exhibit E**, states in part: An officer responding to an on-view incident will immediately notify the dispatcher via voice radio and include the type of incident, and address of incident.

   a.   However, at 2:36:36 a.m. STILLMAN failed to immediately notify the dispatcher via voice radio and include the type of incident, and address of incident, in violation of General Order G03-01-01.

211. The Special Order titled "Body Worn Cameras", S03-14, attached hereto as **Exhibit F**, dated April 30, 2018, states in part: Department members are required to activate their body-worn camera system to event mode at the beginning of an incident and will record the entire incident of all law-enforcement-related activities.

212. Eric Stillman was equipped with an Axon Body Camera on March 29, 2021.

    a. However, at 2:36:36 a.m. - 2:38:15 a.m. STILLMAN failed to activate BWC video and audio at beginning of incident, at the beginning of responding to ShotSpotter in violation of General Order G03-01-01.

213. At approximately 2:38:20 a.m., STILLMAN and his partner, CPD Officer Corina Gallegos ("Gallegos") arrived at the scene.

214. The officers located ADAM and Roman near an alleyway, jumped out of their unmarked squad car, and immediately pursued the two on foot, without considering the other viable alternatives recognized and recommended by CPD policy and training.

215. The general order titled "Force Options", G03-02-01 dated February 28, 2020, states in part:

> The department expects members to develop and display the skills and abilities that allow them to regularly resolve confrontations without resorting to force, or by using only the amount of force required under the circumstances….Members will continually assess situations and determine….if the seriousness of the situation required an immediate response or whether the member can employ other force options or the Force Mitigation Principles….Members should provide for a safe and effective route for additional Department members and other resources to approach the incident scene…..

    a. However, at 2:38:15 a.m. STILLMAN failed to communicate tactical plan with partner after seeing suspects and scene in violation of G03-02-01.

29

216. The General Order titled "Use of Force", G03-02 dated February 28, 2020, and attached hereto as **Exhibit G,** states in part:

> Department members must consider tactical and operational risk factors before initiating a foot pursuit… Officers must assess the totality of circumstances for an appropriate response…Department members must use de-escalation techniques to prevent or reduce the need for force… Any use of force must be objectively reasonable, necessary, and proportional to the threat. When or if the subject offers less resistance, however, the member will decrease the amount or type of force accordingly. Officers should communicate and coordinate tactical plans when feasible. Department members should request backup when appropriate. Officers should consider alternatives including containment and establishing a perimeter. Department members must balance the need to apprehend the subject with the risk to the public and officers… The use of deadly force is a last resort that is permissible only when necessary to protect against an imminent threat to life or to prevent great bodily harm to the member or another person.

> a. However, at 2:38:26 a.m. STILLMAN failed to assess the totality of the circumstances for an appropriate response in violation of General Order G03-02

217. The Uniform Order titled "Uniform and Appearance Standards," U04-01, dated March 11, 2020, states in part:

> All sworn and uniformed civilian members…wear or carry only prescribed, alternate, or optional items authorized by the Department while on duty.

> a. However, at 2:38:20 a.m. STILLMAN failed to wear or carry only prescribed clothing authorized by the Department, in violation of Uniform Order 04-01 and wore a non-regulation blue and white buffalo check gaiter scarf.

218. The Uniform Order titled "Prescribed Uniform and Equipment Items," U04-01-01, dated July 15, 2019, states in part:

> All sworn personnel are required to own and maintain the prescribed uniform/equipment items listed in this directive.…[O]n duty members, unless otherwise specified, will use only those uniform/equipment items listed in the Department's Uniform and Equipment Specifications Manual or this directive.

a. However, at 2:38:20 a.m. STILLMAN failed to wear the uniform listed in the Department's Uniform and Equipment Specifications Manual in violation of Uniform Order 04-01-01

219. The Uniform Order titled "Cap - Baseball Type," U06-01-03, attached hereto as **Exhibit H**, dated September 30, 2019, states in part:

Color: Dark navy #555.

a. However, at 2:38:20 a.m. STILLMAN wore a light khaki green baseball cap in violation of the Uniform Order 06-01-03.

220. STILLMAN's non-compliant appearance and failure to properly identify himself as a police officer increased the risk of confusion, delayed recognition, miscommunication, and escalation during the encounter with ADAM.

221. The CITY's directives requiring identifiable and regulation-compliant uniforms existed because the CITY knew clear identification and communication are important during rapidly evolving encounters, especially encounters involving foot pursuits, commands, and use-of-force decisions.

222. Despite that knowledge, the CITY failed to adequately supervise, monitor, enforce, or correct violations of those directives.

223. Within seconds, at approximately 2:38:27 a.m., STILLMAN tackled Roman, who was then detained by Officer Gallegos.

224. ETB #18-01, titled "Foot Pursuits Training Bulletin", attached hereto as **Exhibit I,** and dated January 2018, states in part that:

31

**Department members will engage in a foot pursuit only when they have reasonable articulable suspicion to conduct an investigatory stop or probable cause to arrest.**

Department members are reminded that a subject's action in fleeing from the police, by itself, does not automatically amount to reasonable articulable suspicion to conduct an investigatory stop or probable cause to arrest. However, a subject fleeing upon sight of a clearly identifiable police officer can be one factor in the totality of the circumstances to establish reasonable articulable suspicion. Factors that can contribute to an officer being "clearly identifiable" include whether or not the officer is in uniform or wearing a vest or other garment clearly marked "POLICE," whether or not they are in a marked vehicle, and whether they verbally announced their office.

Officers should not separate from their partner absent exigent circumstances. Officers acting alone ("99" units) should consider this as a factor in determining whether to engage in a foot pursuit, and should use extra caution if they decide to do so. "Separation" is any situation in which one officer is unable to immediately render aid or otherwise assist the other officer in the apprehension of the subject.

No officer can prevent every subject from fleeing. Once a subject flees, officers need to make a quick decision as to their most prudent course of action. If an officer does not have reasonable articulable suspicion or probable cause to stop a subject, an officer should not engage in a foot pursuit. For example, if a subject looks in the direction of an officer and begins to run, and there are NO other factors to contribute to reasonable articulable suspicion, the officer should not engage in the foot pursuit. Officers should also take other immediate factors into consideration.

Officers will discontinue the foot pursuit if they determine that the risk to themselves, the subject, or the public outweigh the need to apprehend the subject, or if instructed to do so by a supervisor. Other potential response options may include obtaining backup from other members, establishing a perimeter to contain the subject, or requesting assistance from specialized units.

- Be mindful of weapon retention and weapon discipline. Running with a firearm in hand is to be avoided.

- Activate the body worn camera and/or in-car video system at the beginning of the incident, record throughout the entire incident, and conform to other requirements regarding body worn and in car cameras consistent with Department policy.

- Monitor radio communications for additional information from OEMC, the location of the responding units, or guidance and direction from supervisors.

    a. However, at 2:38:31 a.m. STILLMAN had no reasonable articulable suspicion to pursue ADAM and conceded that ADAM was not committing a crime in violation of ETB #18-01;

    b. However, STILLMAN was not clearly identifiable as a police officer as he was not in uniform and was in an unmarked car in violation of ETB #18-01;

32

c. However, STILLMAN separated from his partner when he pursued ADAM in violation of ETB #18-01;

d. However, STILLMAN engaged in a foot pursuit in violation of ETB #18-01;

e. However, STILLMAN failed to obtain backup and establish a perimeter in violation of ETB #18-01;

f. However, STILLMAN unholstered his weapon while running in violation of ETB #18-01;

g. However, STILLMAN failed to timely activate his body worn camera in violation of ETB #18-01;

h. However, STILLMAN failed to monitor radio communications in violation of ETB #18-01.

225. The training bulletin titled "Force Mitigation", ETB# 16-01, attached hereto as

**Exhibit J,** dated November 2020 states in part:

> Department members must use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances… At all times, a member's use of force must be objectively reasonable, necessary, and proportional to the threat, actions, and level of resistance offered by a subject based on the totality of the circumstances… When it is safe and feasible to do so, use time, tactical positioning, and continual communication to de-escalate the situation and prevent or reduce the need of force.

a. However, at 2:38:31 a.m. STILLMAN failed to establish and use de-escalation plan/techniques in violation of ETB #18-01 and ETB #16-01

b. However, at 2:38:31 a.m. Failure to utilize containment techniques in violation of ETB #16-01

c. However, at 2:38:31 a.m. STILLMAN failed to use tactical positioning and continued communication to de-escalate the situation in violation of ETB #16-01

d. However, at 2:38:32 a.m. STILLMAN failed to keep his deadly weapon holstered while running in violation of ETB #18-01 unholstered his deadly weapon and ran with it despite training instructing officers to avoid this practice (ETB #18-01).

226. These CPD Orders and training bulletins existed because CITY knew that foot pursuits are inherently dangerous, rapidly evolving, and increase the risk of escalation, threat misperception, communication breakdown, tunnel vision, and unnecessary force.

227. Despite that knowledge, CITY failed to adequately supervise, monitor, discipline, correct, or intervene when officers disregarded those principles.

### A. THE MOMENT FORCE WAS USED

228. Upon receiving STILLMAN's commands to "show me your f***ing hands" ADAM slowed, stopped, turned, and raised his hands.



229. ADAM was not advancing on STILLMAN.

230. ADAM was not lunging at STILLMAN.

231. ADAM was not chasing STILLMAN.

34

232.    ADAM was not pointing a weapon at STILLMAN.

233.    ADAM did not say one word to STILLMAN.

234.    ADAM did not pose an imminent threat of death or great bodily harm.

235.    The General Order titled "Use of Force", G03-02 dated February 28, 2020, *see*

**Exhibit G**, states in part:

> Department members must consider tactical and operational risk factors before initiating a foot pursuit… Officers must assess the totality of circumstances for an appropriate response…Department members must use de-escalation techniques to prevent or reduce the need for force… Any use of force must be objectively reasonable, necessary, and proportional to the threat. When or if the subject offers less resistance, however, the member will decrease the amount or type of force accordingly. Officers should communicate and coordinate tactical plans when feasible. Department members should request backup when appropriate. Officers should consider alternatives including containment and establishing a perimeter. Department members must balance the need to apprehend the subject with the risk to the public and officers… The use of deadly force is a last resort that is permissible only when necessary to protect against an imminent threat to life or to prevent great bodily harm to the member or another person.

a.  However, at 2:38:40 a.m. STILLMAN failed to properly reassess immediate threat before use of deadly force in violation of General Order 03-02.

b.  However, at 2:38:40 a.m. STILLMAN used deadly force after ADAM had stopped, turned, and raised his hands without justification in violation of General Order 03-02.

c.  However, at 2:38:40 a.m. STILLMAN used deadly force as his first option rather than a last resort in violation of General Order 03-02.

d.  However, at 2:38:40 a.m. STILLMAN failed to request backup in violation of General Order 03-02.

e.  However, at 2:38:40 a.m. STILLMAN failed to employ available de-escalation techniques and less-lethal force alternatives including verbal persuasion, tactical positioning, tactical repositioning, containment, waiting for additional resources, taser deployment, OC spray, baton techniques, canine deployment, and other

force mitigation options, before resorting to deadly force in violation of General Order 03-02.

236. As he chased ADAM, STILLMAN pointed his weapon-mounted strobe light, a Streamlight TLR-1 HL with an output of approximately 1,000 lumens, toward ADAM. The manufacturer warns users to avoid direct eye exposure, that the beam may be harmful to eyes, and not to stare into the beam. STILLMAN admitted that the strobe function was intended to disorient ADAM and could also distort STILLMAN's own vision.[3]

237. STILLMAN intentionally fired one shot into ADAM's chest. ADAM collapsed backward.

238. ADAM died from the gunshot wound.

239. The shooting was caused by STILLMAN's own tactical decisions, including separating from his partner, pursuing ADAM alone, failing to request backup, failing to use time as a tactic, advancing with a drawn firearm, using a disorienting strobe light, and failing to reassess when ADAM stopped, turned, and raised his hands.

240. CITY knew that those tactics increased the risk of unconstitutional force.

241. CITY nevertheless failed to adequately enforce, supervise, monitor, correct, or meaningfully discipline violations of those principles despite prior notice from the Consent

---

[3] Similarly, this court has recognized that law-enforcement "distraction" or "disorientation" devices utilizing intense light, explosive force, or sensory overload can impair perception, orientation, and judgment rather than facilitate safe de-escalation. See *Chicago Headline Club v. Noem*, No. 25 C 12173, slip op. at 127–128 (N.D. Ill. Nov. 20, 2025) (Ellis, J.). Here, Defendant Stillman admitted that the high-intensity strobe light he deployed immediately before firing his weapon could distort both Adam Toledo's vision and the officer's own visual perception, thereby impairing accurate perception and escalating confusion in an already rapidly evolving encounter.

Decree, CPD training materials, tactical advisories, body-worn-camera violations, force incidents, and officer-specific warning signs involving STILLMAN.

242. The fatal shooting of ADAM was therefore not an isolated or unforeseeable event. It was the foreseeable consequence of escalating tactics, inadequate supervision, failures of accountability, and the CITY's deliberate indifference to known risks involving foot pursuits, officer-created danger, de-escalation failures, and unconstitutional force.

243. The constitutional violations and tactical failures described herein were not isolated, spontaneous, or unforeseeable acts occurring in a vacuum.

244. The fatal encounter with ADAM was not the result of a sudden, unavoidable, or isolated split-second decision.

245. Rather, the encounter was progressively escalated through a series of STILLMAN's violations of orders, training, and policy, which the CITY knew created heightened risks of unnecessary and unconstitutional force during foot pursuits and rapidly evolving encounters.

246. The CITY knew through its own policies, training materials, Consent Decree obligations, and training witnesses that officers were required to slow encounters, communicate effectively, identify themselves, use containment and perimeter techniques, request backup, continually reassess evolving circumstances, and use de-escalation and time as tactics to reduce the likelihood of deadly force.

247. The CITY further knew that officers who separated from partners, pursued alone, advanced with firearms drawn, failed to reassess, and accelerated encounters created foreseeable risks of confusion, threat misperception, and unconstitutional force.

37

248. Despite that knowledge, the CITY failed to adequately supervise, monitor, enforce, or correct violations of those principles.

249. As a result, STILLMAN escalated the encounter with ADAM rather than slowing or containing it, failed to use available alternatives to deadly force, failed to meaningfully reassess the circumstances as they evolved, and ultimately shot and killed ADAM after ADAM slowed, stopped, turned, and raised his hands.

## IV. POST-SHOOTING MEDICAL AID

250. After shooting ADAM, STILLMAN radioed for medical assistance.

251. ADAM lay on the ground bleeding from a gunshot wound to the chest.

252. ADAM experienced conscious pain and suffering for approximately eight to nine seconds prior to losing consciousness and dying from his injuries.

253. STILLMAN failed to immediately provide adequate lifesaving aid consistent with the severity and location of ADAM's wound in violation of General Order 03-02 which states:

> Once the scene is safe and as soon as practical, department members must immediately request appropriate medical aid for any individual who is injured, complains of injury, or requests medical attention. This includes contacting emergency medical services through the Office of Emergency Management and Communications (OEMC). The order further provides that department members may render medical aid consistent with their training, including providing first aid and life-saving measures until medical personnel arrive. Additionally, members are required to treat all injured persons with dignity and respect, regardless of whether the individual is a subject, a member of the public, or another officer. These requirements reflect the department's emphasis on the preservation of human life and mandate prompt action to ensure injured individuals receive necessary medical care following any use of force.

*See* **Exhibit G.**

254. STILLMAN did not immediately apply appropriate lifesaving intervention to stop the flow of blood from ADAM's chest wound.

255. STILLMAN applies a faulty chest seal 90 seconds after ADAM was shot.

256. STILLMAN attempts to perform CPR before a new chest seal is applied, which exacerbated the speed of blood loss.

257. STILLMAN did not perform CPR in accordance with American Heart Association guidelines.

258. STILLMAN then applies a second chest seal to ADAM's chest, 115 seconds after shooting ADAM. STILLMAN continues CPR.

259. An ambulance arrives just under 6 minutes after shots were fired.

260. The Uniform Order titled "Individual First Aid Kit (IFAK) and Mini First Aid Kit (MFAK)", U06-02-23, attached hereto as **Exhibit K,** and dated March 25, 2020, states in part:

> This specification continues the use of the IFAK pouch and prescribes the minimum required contents to be carried or worn by a department member that has completed Chicago Police Department's (LEMART) course… A department member involved in an incident that requires the direct rendering of on-scene medical aid prior to the arrival of any Chicago Fire Department/Emergency Medical Services (EMS) will receive contents replacement on a one-for-one basis. Items will be replaced by responding CFD apparatus, if available, and only be replaced if a CFD Ambulance transports a patient to a hospital. Items will be replaced consistent with the procedures delineated in the Individual First Aid Kit (IFAK). The following IFAK and MFAK pouch contents will be replaced: combat application tourniquet (CAT); HyFin vent chest seal (not available on CFD apparatus); any direct pressure bandage (e.g., OLAES, NAR-ETD, other commercial direct pressure bandage) recommended by LEMART (not available on CFD apparatus); trauma shears (if broken); Quikclot

combat gauze (not available on CFO apparatus); petroleum gauze; and cardiopulmonary resuscitation (CPR) face-shield.

    a. However, at 2:38:55 a.m. STILLMAN failed to immediately request medical aid via OEMC in violation of General Order 03-02.

    b. However, at 2:38:55 a.m. STILLMAN failed to provide medical aid consistent with Uniform Order 06-02-23.

    c. However, at 2:38:55 a.m. STILLMAN failed to use issued medical equipment in violation of Uniform Order U06-02-23.

261. Emergency medical personnel thereafter took over resuscitation efforts.

262. ADAM was pronounced dead by Chicago Fire Department personnel at approximately 2:46 a.m.

263. Per the Cook County Medical Examiner Ordinance 38-121 CPD is required to notify the Medical Examiner "immediately" of a death.

264. CPD did not let the Medical Examiner know of ADAM's death until 4:09 a.m.

265. The Cook County Medical Examiner determined that ADAM died by homicide from a gunshot wound.

266. STILLMAN left the scene in an ambulance due to an elevated heartbeat.

267. ADAM laid on the pavement until 5:02 am.

**V.    STILLMAN'S SWORN ADMISSIONS CONFIRM THAT DEADLY FORCE WAS NOT JUSTIFIED AND THAT THE SHOOTING WAS AVOIDABLE**

268. Defendant STILLMAN has made the following unequivocal admissions in his response to requests to admit, his COPA statement, his Answer to the Second Amended Complaint, and his deposition testimony as follows:

a. STILLMAN admits he was a Chicago Police Officer acting within the scope of his employment at all relevant times.

b. STILLMAN admits that he's not trying to defend this case.

c. STILLMAN admits that on March 29, 2021, he intentionally shot ADAM in the chest and ADAM fell backwards after being shot.

d. STILLMAN admits he made the following statement to COPA: "I know that he's going to go ahead and if he turns at me he's going to shoot me. I know he's going to kill me. I just know it. He starts to turn, I end up shooting. I shoot one time."

e. STILLMAN admits that at no time did ADAM point a weapon at him nor anyone else, never chased him, never chased anyone else, never lunged at him, never said anything to him, was not committing a crime when he approached him but was simply standing in the alley, he did not recognize ADAM, and he did not ask ADAM his name or for identification.

f. STILLMAN admits he pursued ADAM on foot.

g. STILLMAN admits he separated from his partner during the foot pursuit.

h. STILLMAN admits he unholstered his service weapon during the pursuit.

i. STILLMAN admits he shot ADAM in the chest, and ADAM died as a result.

j. STILLMAN admits that he stopped firing at ADAM because he reassessed and saw ADAM's hands were visible and empty.

k. STILLMAN admits that the Cook County Medical Examiner determined ADAM's death was a homicide.

l. STILLMAN admits that prior to engaging in the foot pursuit, he did not request any back up or additional units.

41

m. STILLMAN admits that time as a tactic is a technique that should be considered based on his training in connection with foot chases and would mean slowing things down.

n. STILLMAN admits that calling for a perimeter is an alternative to a foot chase and he did not call for a perimeter.

o. STILLMAN admits he could have not engaged in the foot chase which would be consistent with his training in order to avoid the shooting.

p. STILLMAN admits that he only turned on his body worn camera when he was running in the alley even though he knew he was responding to a shot spotter call.

q. STILLMAN admits that even though he knew he intended to have this encounter he did not turn on his body worn camera "because everything happened very quick, and it wasn't the first thing that came to mind. I was thinking about a million other things."

r. STILLMAN admits he did not know where his own partner was at the moment he shot at ADAM.

s. STILLMAN admits that a foot pursuit is inherently dangerous.

t. STILLMAN admits that that any decision to engage in a foot pursuit must be given proper consideration and ought to occur within the training you received on foot pursuits.

u) STILLMAN admits he does not know his exact commands to ADAM.

v) STILLMAN admits ADAM stopped.

w) STILLMAN admits that he failed to activate his body worn camera at the beginning of the incident.

42

x) STILLMAN admits that prior to the foot pursuit he did not request backup.

y) STILLMAN admits that the first time he observed an alleged firearm in ADAM's hand was at the fence [immediately before he shot ADAM].

z) STILLMAN admits that he did not know ADAM's identity or any distinguishing characteristics prior to the pursuit.

aa) STILLMAN admits that as a patrol officer, he was required to follow all general orders, special orders, rules, regulations, and electronic training bulletins in effect on March 29, 2021.

bb) STILLMAN admits that he did not participate in the creating, drafting, formulation, or implementation of any procedures, CPD general orders, special orders, ETBs, or policies regarding use of force, training, hiring, or equipment.

cc) STILLMAN admits that he was familiar with the CPD's use of force policy and that it provided for response options other than deadly force, including the use of a TASER, pepper spray, and canines, in certain circumstances.

dd) STILLMAN admits that on March 29, 2021, he was carrying a baton and pepper spray, but not a TASER.

ee) STILLMAN admits that he is no longer familiar with CPD's use of force guideline general order.

ff) STILLMAN admits that the sanctity of life is to be protected to the highest possible standard, that he learned this while at CPD and learned it prior to March 29, 2021.

gg) STILLMAN admits that the event was very fast, and he did not have time to think about what he was going to do; he acted quickly in the moment.

43

hh) STILLMAN admits that he did not announce on the radio or in any document that he was going to shoot ADAM before doing so.

ii) STILLMAN admits that he had a medical kit in his vehicle but he did not retrieve his medical kit from his car after the shooting.

jj) STILLMAN admits that he was not physically injured during the incident, other than an elevated heart rate.

kk) STILLMAN admits that he disclosed a veterans disability on his CPD application, including 10% for back, 10% for stress, and 10% for scars, and that he has used a veterans exemption with the Cook County Assessor's Office from 2019-2023 [for a yearly Cook County property tax reductions].

## VI.   THE FORENSIC EVIDENCE DOES NOT ESTABLISH THAT ADAM POSSESSED OR USED THE FIREARM AT THE MOMENT HE WAS SHOT

269.   A Ruger firearm was recovered at the scene after the shooting.

270.   The firearm was not recovered from ADAM's hands. A crime scene photo dated March 29, 2021 attached hereto as **Exhibit L.**

271.   The firearm was recovered approximately eight feet away from ADAM's head, on the other side of the fence from where his feet. *Id.*

272.   Latent fingerprint analysis did not identify ADAM's fingerprints on the firearm, magazine, or cartridge casings. The Illinois State Police Reports attached hereto as **Exhibit M**.

273.   The ISP laboratory reported "no suitable latent prints" on the Ruger allegedly found at the scene. *Id.*

274. DNA testing likewise did not establish that ADAM possessed, handled, or used the firearm. *Id.*

275. Any DNA findings were limited, mixed, inconclusive, or non-activity-level findings. They did not establish possession, handling, use, timing, or the circumstances under which any DNA may have been deposited. *Id.*

276. The CITY's own forensic evidence therefore does not tie ADAM to the gun in any meaningful way. *Id.*

277. Thus, while the CITY attempts to paint a picture that ADAM "had a gun", there is no reliable forensic evidence establishing that ADAM possessed the firearm, pointed it at STILLMAN, threatened STILLMAN with it, or had it in his hands at the moment STILLMAN fired.

278. In any event, the constitutional question turns on the precise moment deadly force was used. At that moment, ADAM had stopped, turned, and raised his hands.

## VII. AFTERMATH OF THE SHOOTING

279. The CITY also attempted to portray ADAM in a negative light after the shooting.

280. In fact, after the shooting, the CITY went into juvenile court to obtain ADAM's record, however ADAM had no criminal history whatsoever.

281. STILLMAN admitted he had never seen ADAM before the night of the shooting and did not observe any distinguishing characteristics.

282. Public statements after the shooting further undermine CITY's narrative.

283. Mayor Lori Lightfoot stated she had seen "no evidence whatsoever" that ADAM shot at police before STILLMAN killed him.[4]

284. On April 15, 2021, following the public release of body-worn camera footage of the shooting of ADAM, Mayor Lori Lightfoot publicly acknowledged the gravity of the incident, stating, "[t]his is a very difficult moment for our city… the video is extremely difficult to watch" [5]

285. Further, during an April 21, 2021 press conference Mayor Lori Lightfoot stated "[s]imply put, we failed Adam"[6].

286. These statements constitute direct evidence that a final municipal policymaker had immediate notice that the shooting raised serious constitutional concerns regarding the use of deadly force.

287. This acknowledgment, made contemporaneously with recognition of the disturbing nature of the video, demonstrates that CITY policymakers understood the gravity of the incident and the obvious need for corrective measures.

288. Despite this awareness, CITY failed to implement adequate safeguards, training modifications, or supervision reforms prior to the shooting at issue here.

289. This failure supports a finding of deliberate indifference.

---

[4] See https://www.nbcchicago.com/news/local/lightfoot-says-video-does-not-show-adam-toledo-fire-at-police-ahead-of-fatal-shooting/2487340/

[5] *See* https://www.chicagotribune.com/2021/04/15/as-chicago-mayor-lori-lightfoot-makes-emotional-call-for-peace-after-release-of-adam-toledo-video-other-politicians-lambaste-police-you-did-not-have-to-shoot-that-kid/

[6] *See* https://chicago.suntimes.com/2021/4/15/22385699/adam-toledo-police-shooting-videos-lightfoot-family-attorneys-statement-protests

290.     Likewise, years later, Mayor Brandon Johnson ended Chicago's ShotSpotter contract after the technology had been criticized as ineffective and controversial, further undermining any attempt to treat a ShotSpotter alert as proof of danger, criminality, or justification for deadly force. The CITY announced it would not renew the contract on February 13, 2024, and would decommission ShotSpotter technology on September 22, 2024.[7]

291.     Following the shooting of TOLEDO, the Civilian Office of Police Accountability ("COPA") issued a comprehensive report regarding the conduct of STILLMAN.

292.     COPA determined that STILLMAN violated CPD policy by: (1) discharging his firearm at TOLEDO in violation of General Order 03-02; (2) acting inconsistently with CPD Foot Pursuit Training Bulletin ETB #18-01; and (3) failing to timely activate his body-worn camera in violation of Special Order S03-12. *See* COPA Report attached hereto as **Exhibit N.**

293.     COPA further recognized that CPD policies governing use of force and foot pursuits require officers to use force only when objectively reasonable, necessary, and proportional under the totality of the circumstances, and further require officers to utilize de-escalation techniques and continuously reassess threats during encounters and pursuits.

294.     COPA specifically noted that CPD policy characterizes deadly force as a "last resort" permissible only where an officer reasonably believes there exists an imminent threat of death or great bodily harm. These findings support Monell liability under controlling Seventh Circuit authority.

---

[7] *See* https://www.npr.org/2024/02/15/1231394334/shotspotter-gunfire-detection-chicago-mayor-dropping

295. Taken together, the CITY's own forensic record, STILLMAN's admissions, the lack of any juvenile criminal history, and the later public retreat from ShotSpotter all point to the same conclusion: the CITY's after-the-fact narrative does not answer the constitutional question. The question is what STILLMAN reasonably perceived at the moment he fired. At that moment, ADAM was stopped, turned, and raising his hands.

296. In the aftermath STILLMAN filed a worker's compensation claim against CPD on September 16, 2021, arising from an alleged elevated heart rate after his foot pursuit and shooting of ADAM.

**VIII. THE CITY'S TRAINING WITNESS CONFIRMS THAT THE CITY KNEW THE RELEVANT RISKS AND PRINCIPLES**

297. The CITY's own training witness, Lieutenant John Benigno ("John Benigno"), testified that the purpose of training is to produce officers who act in conformity with constitutional principles and procedural justice.

298. Benigno testified that de-escalation and use-of-force training was mandatory.

299. Benigno testified that foot-pursuit material was part of required training before March 29, 2021.

300. Benigno testified that officers were trained to reassess.

301. Benigno testified that constant assessment during a foot pursuit is important.

302. Benigno testified that de-escalation is intended to reduce or eliminate the need for force.

303. Benigno testified that officers may consider perimeter and containment concepts, including using time, distance, and coordination rather than immediate escalation.

304. Benigno testified that running with a firearm in hand needs to be avoided.

305. Benigno testified that the strobe function of a weapon-mounted light is intended to disorient a subject—not to serve as general illumination.

306. However, Benigno further testified that there was no training on when to use or not use the strobe function, leaving officers with a potentially high-impact tool, without guidance on its safe and appropriate use.

307. Benigno's testimony establishes that the CITY knew the exact principles required to prevent unnecessary force: continuous reassessment, de-escalation, containment, perimeter use, disciplined pacing, and avoidance of tactics that heighten rather than reduce danger.

308. These were not obscure concepts. They were core training mandates.

309. Benigno's testimony also forecloses any claim of ignorance. The CITY knew why these principles mattered, knew that training was intended to produce constitutional conduct, and knew that officers who failed to follow these principles increased the risk of unnecessary and unconstitutional force.

310. The failure here was not a lack of policy or instruction—it was a failure to enforce, supervise, correct, and hold officers accountable when those principles were repeatedly disregarded.

## IX. THE CITY'S DISCOVERY MISCONDUCT, CONCEALMENT OF RECORDS, AND OBSTRUCTION OF ACCOUNTABILITY

311. The events surrounding ADAM's death did not end with the shooting itself.

312. During the prior state-court litigation, Plaintiffs repeatedly requested records relating to Defendant STILLMAN's prior use-of-force incidents, disciplinary history, training history, tactical conduct, body-worn-camera compliance, supervisory review history, and related materials directly relevant to municipal notice, supervision, accountability, training, and deliberate indifference. As a result, Plaintiff had three pending motions for sanctions before the court.

313. Those requests expressly sought documents relating to foot pursuits, use of force, de-escalation, administrative complaints, training records, disciplinary materials, and STILLMAN's prior use-of-force history.

314. Despite those requests, Defendants CITY OF CHICAGO and STILLMAN repeatedly denied possession of responsive records, objected to production, withheld responsive materials, delayed disclosure, and represented that responsive materials either did not exist or were not being produced.

315. On April 8, 2024, Plaintiffs filed a Motion to Compel and for Sanctions arising from Defendants' discovery conduct. During discovery, Defendants repeatedly obstructed disclosure, including by refusing to correlate nearly 10,000 pages of document production to Plaintiffs' requests, producing large volumes of irrelevant materials, refusing affidavits of compliance and verifications required by Illinois Supreme Court Rules, refusing affidavits concerning insufficient knowledge, and improperly instructing witnesses not to answer deposition questions, resulting in substantial additional motion practice.

316. Throughout discovery, Plaintiffs were forced to independently obtain publicly available CITY documents and provide those same documents back to Defendants despite

50

CITY's obligation to disclose responsive materials already within its possession, custody, and control.

317. Thereafter, on January 2, 2025, Plaintiffs obtained thirty-two pages of previously undisclosed use-of-force reports involving STILLMAN and tendered those materials to Defendants without objection.

318. Those reports involved incidents predating the fatal shooting of ADAM and reflected prior force incidents, training recommendations, tactical advisements, body-worn-camera compliance issues, and injury-related information relevant to CITY's notice concerning STILLMAN's repeated conduct during force encounters before ADAM was killed.

319. Those reports had been specifically requested by Plaintiffs more than two years earlier.

320. Defendants' discovery conduct called into question the integrity and completeness of Defendants' production and reflected broader failures of transparency, accountability, supervision, and institutional candor concerning police misconduct, force review, and municipal liability issues.

321. On September 30, 2025, the court itself observed that discovery issues involving CITY had arisen before other judges as well and stated that obtaining discovery from CITY was like "pulling teeth."

322. The evidence in this case demonstrates that the constitutional violations resulting in ADAM's death were not caused solely by the isolated actions of a single officer, but were the foreseeable result of CITY's customs, practices, failures of supervision and accountability,

51

deliberate indifference to known risks, and repeated failure to meaningfully enforce its own policies, training requirements, and constitutional policing standards.

323.    CITY repeatedly concealed, withheld, delayed, and obstructed disclosure of records relating to officer misconduct, force incidents, training deficiencies, and supervisory failures because those records exposed municipal notice, institutional failures, and CITY's awareness of recurring unconstitutional conduct before thirteen-year-old ADAM was shot and killed.

## X.    ADAM'S FAMILY LOSS

324.    ADAM was the son of Elizabeth Toledo and Marco Toledo. His parents loved him, raised him, and shared with him a parent-child relationship defined by love, companionship, guidance, affection, concern, protection, and the mutual expectation of a continuing family life.

325.    His death deprived each parent not merely of his physical presence, but of the continuation of that relationship for the remainder of their lives.

326.    ADAM was also a brother. He had siblings, including Esmeralda, Marco Jr., Andres, and Anthony.

327.    ADAM's death permanently altered the structure and emotional life of the ADAM family. It deprived his siblings of his companionship, affection, and presence within the family.

328.    It deprived his younger brother, Anthony, in particular, of the relationship that would have developed throughout childhood and into adulthood.

329. Because ADAM was only thirteen, the loss inflicted by his death includes the loss of everything that would ordinarily unfold in the years that followed: growth, milestones, shared holidays, guidance between parent and child, and sibling relationships maturing over time.

330. His death deprived Elizabeth Toledo and Marco Toledo of the opportunity to watch their son grow into adulthood and to share in the life he would have lived.

331. It likewise deprived the family of years of society, companionship, affection, guidance, and mutual support that would otherwise have followed.

332. As a direct and proximate result of Defendants' conduct, Elizabeth Toledo and Marco Toledo have suffered and will continue to suffer grief, sorrow, mental suffering, loss of society, and all other damages recoverable under the Illinois Wrongful Death Act.

333. ADAM's Estate has likewise suffered survival damages, including damages for the conscious pain, suffering, fear, emotional distress, bodily injury, that ADAM experienced prior to his death.

334. These harms were direct and significant consequences of Defendants' conduct.

335. The victim here was a thirteen-year-old child, and the loss is measured not only in the violence of the final seconds, but in the entire life—and family future—that were destroyed.

## COUNT I
### 42 U.S.C. § 1983 — FOURTH AMENDMENT EXCESSIVE FORCE
### Against Defendant Eric STILLMAN

336. Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

337. At all relevant times, STILLMAN acted under color of state law.

338. The Fourth Amendment protects persons from unreasonable seizures, including seizures accomplished through excessive and deadly force.

339. The Fourth Amendment prohibits officers from using deadly force where the need for force was unreasonably created or escalated by the officer's own conduct under the totality of the circumstances.

340. STILLMAN seized ADAM when he shot him in the chest.

341. STILLMAN used deadly force when no reasonable officer would have believed deadly force was necessary.

342. STILLMAN's conduct violated clearly established constitutional law. Deadly force may not be used against a person who does not pose an immediate threat of serious physical harm. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The Fourth Amendment reasonableness inquiry considers the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

343. STILLMAN's unconstitutional use of deadly force directly and proximately caused ADAM's injuries, conscious pain and suffering, death, and Plaintiffs' damages.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court

shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

## COUNT II
## VIOLATION OF 42 U.S.C. § 1983
### Monell Claim – Widespread Practices, Customs, and Systemic Deficiencies Regarding Foot Pursuits, Escalation, De-Escalation, and Use of Force Against Defendant CITY

344. Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

345. Municipal liability exists where constitutional violations are caused by official municipal policy, widespread practice, municipal custom, deliberate indifference, or failures in training, supervision, monitoring, discipline, or accountability attributable to the municipality.

346. Prior to March 29, 2021, the CITY had clear, repeated, and actual notice that CPD officers faced a known and obvious risk of escalating foot pursuits and rapidly evolving encounters into unnecessary and unconstitutional uses of force.

347. This notice arose from multiple independent sources, including the federal Consent Decree and independent monitoring reports identifying systemic deficiencies in CPD's use-of-force practices, supervision, training, accountability systems, force mitigation practices, and de-escalation requirements.

348. This notice further arose from CPD's own policies, directives, training bulletins, and mandatory training materials, which expressly recognized that foot pursuits require continual reassessment, tactical restraint, de-escalation, containment, perimeter techniques, partner coordination, communication, backup, warnings, and the use of time as a tactic.

349.     Before ADAM was killed, the CITY therefore knew that officers who separated from partners, pursued alone, failed to contain encounters, failed to reassess evolving circumstances, accelerated encounters, advanced with firearms drawn, failed to use de-escalation, and failed to provide meaningful opportunities for compliance created foreseeable risks of unnecessary and unconstitutional force.

350.     Despite this notice, the CITY failed to adequately ensure that constitutional policing requirements and force-mitigation principles were meaningfully enforced in practice.

351.     The CITY failed to adequately ensure that officers complied with de-escalation requirements, reassessment obligations, foot-pursuit limitations, containment principles, tactical communication requirements, and restrictions governing deadly force.

352.     The CITY's failures were not isolated mistakes or sporadic deviations from policy.

353.     Rather, the CITY maintained widespread practices, customs, institutional tolerances, and systemic deficiencies so permanent and well settled as to constitute customs or usages with the force of law.

354.     Those widespread customs and practices included tolerating escalating tactics during foot pursuits, failing to meaningfully enforce de-escalation requirements, failing to require continual reassessment during rapidly evolving encounters, failing to adequately enforce body-worn-camera requirements, failing to require containment and perimeter tactics, and failing to meaningfully intervene after tactical violations and force incidents.

355.     The CITY's policies, practices, customs, and deliberate indifference made it substantially certain that officers would misperceive threats, accelerate encounters, disregard

56

safer alternatives, fail to reassess evolving circumstances, and resort to force in circumstances where force was unnecessary or excessive.

356. The precise risks known to the CITY materialized on March 29, 2021 when STILLMAN separated from his partner, pursued ADAM alone, failed to request or wait for backup, failed to establish containment, failed to slow the encounter, ran with his firearm drawn, failed to meaningfully reassess the encounter after ADAM stopped and turned, and used deadly force when ADAM did not pose an imminent threat of death or serious bodily harm.

357. This was not an isolated or unforeseeable deviation from policy. It was the foreseeable result of the CITY's longstanding failures to meaningfully enforce constitutional policing standards and correct known risks involving foot pursuits, de-escalation, escalation, reassessment, and use of force.

358. The CITY's policies, practices, customs, widespread institutional failures, and deliberate indifference were the moving force behind the unconstitutional seizure, shooting, and death of thirteen-year-old ADAM.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count , costs of said suit, and for any other relief this Court finds just and appropriate.

**COUNT III**
**VIOLATION OF 42 U.S.C. § 1983**

57

**Monell Claim – Failure to Train, Supervise, Monitor, Discipline, and Enforce
Constitutional Policing Requirements
Against Defendant CITY**

359.    Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

360.    Prior to March 29, 2021, the CITY had actual notice through the Consent Decree, independent monitoring reports, CPD directives, Tactical Response Reports, supervisory systems, body-worn-camera advisements, force reviews, officer-specific records, and training materials that deficiencies remained in CPD's supervision, accountability systems, training practices, force mitigation practices, body-worn-camera enforcement, and use-of-force review systems.

361.    The CITY further possessed officer-specific notice concerning STILLMAN, including prior use-of-force incidents, Tactical Response Reports, supervisory advisements, tactical concerns, body-worn-camera compliance issues, injury history, hiring irregularities, and stress-related disclosures.

362.    Despite this notice, the CITY failed to meaningfully retrain, supervise, monitor, discipline, restrict, reassess, or otherwise intervene with respect to STILLMAN despite accumulated warning signs and available intervention mechanisms.

363.    The CITY failed to meaningfully enforce body-worn-camera requirements despite repeated late-activation issues and supervisory advisements involving STILLMAN.

364.    The CITY failed to meaningfully evaluate whether STILLMAN's cumulative force history, tactical conduct, accountability issues, injury history, and other warning signs

58

required heightened supervision, reassessment, fitness review, retraining, restriction, or removal from armed field deployment.

365. The CITY further failed to adequately supervise and enforce compliance with constitutional policing requirements concerning de-escalation, reassessment, tactical restraint, foot pursuits, containment, use of time as a tactic, communication, warnings, and restrictions governing deadly force.

366. These failures reflected deliberate indifference to the known and obvious risk that officers would escalate encounters, fail to reassess evolving circumstances, disregard safer alternatives, misperceive threats, and resort to unnecessary or unconstitutional force.

367. The CITY's own disciplinary charging documents later alleged that STILLMAN's use of deadly force was not necessary to prevent death or great bodily harm and further alleged that STILLMAN acted inconsistently with CPD foot-pursuit requirements, body-worn-camera requirements, backup requirements, and pursuit protocols.

368. Those findings were consistent with Plaintiffs' allegations that the governing standards were known, the risks were known, the officer-specific warning signs were known, and the CITY nevertheless failed to meaningfully enforce corrective controls before ADAM was killed.

369. The CITY's failures to train, supervise, monitor, discipline, and enforce constitutional policing requirements were the moving force behind the unconstitutional seizure, shooting, and death of thirteen-year-old ADAM.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**,

Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1983**
**Monell Claim – Failure to Screen, Retain, Monitor, Reassess, and Deploy**
**Against Defendant CITY of Chicago**

370.    Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

371.    Prior to March 29, 2021, the CITY had actual knowledge of facts demonstrating that STILLMAN presented a heightened and foreseeable risk of engaging in unsafe, escalating, and noncompliant conduct during field encounters involving force, pursuit, threat perception, and tactical decision-making.

372.    Specifically, the CITY knew, among other things, that STILLMAN's application materials contained inconsistencies, omissions, and corrections bearing on candor, honesty, reliability, and judgment.

373.    The CITY further knew that STILLMAN disclosed stress-related conditions relevant to performance under pressure and decision-making in armed police work.

374.    Despite the foregoing disqualifying or materially concerning information revealed during the hiring and screening process, the CITY nevertheless approved, hired, armed, and deployed STILLMAN as a Chicago Police Officer.

375. The CITY further knew that STILLMAN had been involved in multiple prior use-of-force incidents resulting in supervisory review, tactical advisories, training recommendations, body-worn-camera advisements, and documented concerns regarding officer-created risk.

376. The CITY further knew that STILLMAN had repeated body-worn-camera compliance issues undermining accountability and supervision.

377. The CITY further knew that STILLMAN had injury history and duty-related absences bearing on perception, reaction, coordination, tactical judgment, and decision-making under stress.

378. Taken together, these facts created a foreseeable and substantial risk that STILLMAN would escalate encounters, fail to use available tactical alternatives, fail to reassess evolving circumstances, misperceive threat, and resort to force, including deadly force, when such force was unnecessary or unjustified.

379. Despite this actual knowledge, the CITY consciously failed to take meaningful corrective action.

380. The CITY failed to meaningfully discipline, retrain, monitor, reassess, restrict, or otherwise intervene with respect to STILLMAN despite accumulated warning signs and available intervention mechanisms.

381. The CITY nevertheless continued to arm, retain, deploy, and authorize STILLMAN to engage in street-level encounters involving pursuit, seizure, and the potential use of deadly force.

382. The CITY's conduct reflected deliberate indifference to the known and obvious risks presented by STILLMAN's continued armed deployment without meaningful corrective intervention.

383. Defendant CITY knew or should have known that Defendant STILLMAN had a particular unfitness to serve as a Chicago Police Officer so as to create a danger of harm to third persons, in that he had a pre-existing medical and/or mental health condition prior to his date of hire of August 31, 2015, with CITY.

384. That such particular unfitness was known or should have been known at the time of CITY's hiring of STILLMAN for the position of police officer.

385. The precise risks known to the CITY materialized on March 29, 2021 when STILLMAN escalated a foot pursuit, failed to use available tactical alternatives, failed to reassess evolving circumstances, and used deadly force in circumstances where deadly force was not necessary or justified.

386. The CITY's failures to adequately screen, retain, monitor, reassess, supervise, and deploy STILLMAN were the moving force behind the unconstitutional seizure, shooting, and death of thirteen-year-old ADAM.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO,** Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court

shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

## COUNT V
## WRONGFUL DEATH BATTERY
### Against Defendant STILLMAN and Defendant CITY of Chicago

387. Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

388. Plaintiffs bring this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1 et. seq.

389. Defendant STILLMAN intentionally pursued ADAM with his firearm drawn.

390. STILLMAN intentionally pointed, aimed, and discharged his service weapon at ADAM.

391. In doing so, STILLMAN intended to cause a harmful or offensive contact with ADAM, or knew with substantial certainty that discharging a firearm at ADAM's chest would result in such contact.

392. The bullet struck ADAM in the chest.

393. The contact was harmful, offensive and unlawful.

394. ADAM did not consent to the contact.

395. At the moment STILLMAN fired, ADAM did not pose an imminent threat of death or great bodily harm, and STILLMAN therefore lacked legal justification to use deadly force.

396.    STILLMAN's conduct was intentional, willful, and wanton, demonstrating an utter indifference to or conscious disregard for ADAM's life.

397.    STILLMAN's actions directly and proximately caused grievous bodily injury to ADAM, resulting in his death.

398.    As a direct and proximate result of ADAM's death, his next of kin—including his parents and siblings—have suffered and will continue to suffer grief, sorrow, mental suffering, loss of society, loss of companionship, loss of affection, loss of guidance, loss of comfort, loss of protection, loss of attention, and loss of familial relationship.

399.    At all relevant times, STILLMAN was acting within the scope of his employment as a Chicago Police Officer.

400.    Defendant CITY of Chicago is therefore liable for STILLMAN's conduct under the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

## COUNT VI
### SURVIVAL ACT – BATTERY
### Against Defendant STILLMAN and Defendant CITY

401.    Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph

as if fully set forth herein.

402. Plaintiffs bring this claim pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

403. Defendant STILLMAN intentionally pointed, aimed, and discharged his firearm at ADAM, causing harmful and offensive physical contact.

404. The bullet struck ADAM in the chest and caused catastrophic bodily injury.

405. The contact was harmful, offensive, non-consensual, and unlawful.

406. At the time STILLMAN fired, ADAM did not pose an imminent threat of death or great bodily harm, and STILLMAN therefore lacked legal justification to use deadly force.

407. ADAM survived for a period of time after being shot and experienced conscious pain and suffering prior to death, including physical pain, fear, emotional distress, and bodily trauma. The precise nature and duration of such conscious suffering will be established through medical, forensic, and expert testimony.

408. ADAM experienced the terror and trauma associated with being pursued by an armed police officer, illuminated and confronted at gunpoint, shot in the chest, and left wounded prior to death.

409. Had ADAM survived, he would have possessed causes of action for battery and for damages arising from bodily injury, pain and suffering, emotional distress, disability, and loss of a normal life.

410. Pursuant to the Illinois Survival Act, those causes of action survived ADAM's death and may be maintained by his Estate.

411. At all relevant times, Defendant STILLMAN was acting within the course and scope of his employment with Defendant CITY of Chicago.

412. Accordingly, Defendant CITY of Chicago is liable under the doctrine of *respondeat superior*.

413. As a direct and proximate result of Defendants' conduct, ADAM suffered conscious pain and suffering, bodily injury, emotional distress, and other damages recoverable under Illinois law.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

**COUNT VII**
**WRONGFUL DEATH – WILLFUL AND WANTON CONDUCT**
**Against Defendant STILLMAN and Defendant CITY**

414. Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

415. Plaintiffs bring this action pursuant to 740 ILCS 180/1 et. seq., commonly known as the Illinois Wrongful Death Act.

416. At all times relevant, Defendants owed a duty to ADAM to exercise due care and refrain from intentional, willful and wanton conduct in their interaction with ADAM.

66

417. At all times relevant, Defendants breached their duty to ADAM by acting in an intentional, willful and wanton manner with a deliberate intent to harm ADAM, or, if not intentional, one which evidenced an utter indifference to and/or conscious disregard for, the sanctity of ADAM's life, safety and well-being in one or more of the following ways:

a. STILLMAN failed to consider the sanctity of ADAM's life before shooting him;

b. STILLMAN failed to timely activate the audio of his BWC;

c. STILLMAN failed to request the assistance of units that were in close proximity to him;

d. STILLMAN failed to consider the risks to himself, to his partner, to ADAM, and to the public prior to initiating, and during, the foot pursuit;

e. STILLMAN failed to adhere to ETB #18-01 by separating from his partner;

f. STILLMAN failed to keep his weapon holstered, in violation of G03-02, while chasing ADAM, who did not pose an imminent threat of harm;

g. STILLMAN failed to utilize proper de-escalation techniques before using deadly force;

h. STILLMAN failed to issue proper verbal commands before using deadly force;

i. STILLMAN failed to warn ADAM about the impending use of deadly force;

j. STILLMAN failed to permit ADAM to comply with his commands before using deadly force;

k. STILLMAN used deadly force without lawful justification;

l. STILLMAN failed to exercise the proper level of force that was reasonable, necessary, and proportional under the circumstances;

m. STILLMAN failed to consider containment as an appropriate tactic once he thought ADAM had a firearm. ETB #18-01

specifically admonishes officers to discontinue a foot pursuit if they determine that the risk to themselves, the subject, or the public outweighs the need to apprehend the subject;

n. STILLMAN confronted ADAM in an alley without leaving himself viable alternatives to deadly force;

o. STILLMAN failed to promptly and properly administer first aid after shooting ADAM;

p. STILLMAN failed to summon paramedics in a timely fashion to administer emergency medical treatment.

q. The CITY failed to provide STILLMAN proper individual first aid equipment and or failed to adequately train and supervise officers regarding emergency trauma response and deployment of issued medical equipment;

r. The CITY failed to provide adequate training to STILLMAN concerning the use of verbal commands and warnings, deadly force, excessive force, foot pursuits, strobe light use, and de-escalation tactics;

s. Defendants otherwise acted inconsistently with ETB #18-01 and G03-02; and

t. Defendants engaged in other intentional, willful and wanton acts and/or omissions.

418. As the actual and proximate cause of Defendants' intentional, willful and wanton conduct described above, ADAM sustained injuries including, but not limited to, a fatal gunshot wound to the chest, extreme and excruciating pain and suffering, physical and emotional injuries, and death. ADAM would have been entitled to receive compensation from Defendants for these injuries had he survived. Further, ADAM's estate was diminished by reason of expenses that were incurred.

419. ADAM's heirs have suffered and, in the future, will continue to suffer damages including, but not limited to, loss of society and companionship, as the actual and proximate result of the Defendants' intentional willful and wanton acts and/or omissions.

420.    Defendant CITY is liable to Plaintiffs under the Illinois Wrongful Death Act and pursuant to the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO** Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

**COUNT VIII**
**SURVIVAL ACT – WILLFUL AND WANTON CONDUCT**
**Against Defendant STILLMAN and Defendant CITY**

421.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein. Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

422.    Plaintiffs bring this claim pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

423.    At all times relevant, Defendants owed a duty to ADAM to exercise due care and refrain from intentional, willful and wanton conduct in their interaction with ADAM.

424.    At all times relevant, Defendants breached their duty to ADAM by acting in an intentional, willful and wanton manner demonstrating a deliberate intent to harm ADAM, or, if not intentional, one which evidenced an utter indifference to and/or conscious disregard for, the sanctity of ADAM's life, safety, and well-being in the ways set forth in paragraph 417, (a)-(t), above, adopted and incorporated as though fully set forth herein.

425. As a direct and proximate result of STILLMAN's willful and wanton conduct, ADAM sustained catastrophic bodily injuries and experienced conscious pain and suffering, fear, emotional distress, and other injuries prior to death.

426. Had ADAM survived, he would have been entitled to recover damages for those injuries.

427. Pursuant to the Illinois Survival Act, those claims survived ADAM's death and may be maintained by his Estate.

428. At all relevant times, Defendant STILLMAN was acting within the course and scope of his employment with Defendant CITY of Chicago.

429. Accordingly, Defendant CITY of Chicago is liable under the doctrine of *Respondeat Superior.*

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

## COUNT IX
## WILLFUL AND WANTON HIRING, RETENTION, SUPERVISION, MONITORING, AND DEPLOYMENT
### Against Defendant CITY

430. Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph

70

as if fully set forth herein.

431. Plaintiffs bring this claim pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

432. At all relevant times, Defendant CITY of Chicago owed a duty to members of the public, including ADAM, to refrain from willful and wanton conduct in the hiring, retention, supervision, monitoring, discipline, reassessment, and deployment of armed police officers.

433. Willful and wanton conduct includes a course of action demonstrating an actual or deliberate intent to cause harm or, if not intentional, an utter indifference to or conscious disregard for the safety of others.

434. Prior to March 29, 2021, the CITY had actual knowledge of facts demonstrating that Defendant STILLMAN presented a heightened and foreseeable risk of engaging in unsafe, escalating, and noncompliant conduct during field encounters involving force, pursuit, threat perception, and tactical decision-making.

435. Specifically, the CITY knew, among other things:

   a. That STILLMAN's application materials contained inconsistencies, omissions, and corrections bearing on candor, reliability, and judgment;

   b. That STILLMAN disclosed medical, health and stress-related conditions relevant to performance under pressure and decision-making in armed police work;

   c. That STILLMAN had been involved in multiple prior use-of-force incidents resulting in supervisory review, tactical advisories, and documented concerns regarding officer-created risk;

   d. That STILLMAN had repeated body-worn-camera compliance issues undermining accountability and supervision;

   e. That STILLMAN had injury history and duty-related absences bearing on perception, reaction, coordination, and decision-making under stress; and

   f. That CPD policies, training materials, and the Consent Decree identified the precise risks implicated by those facts, including escalation during foot pursuits, failure to reassess, failure to use containment, and unnecessary uses of force.

71

436. Taken together, these facts created a foreseeable and substantial risk that STILLMAN would escalate encounters, fail to use available tactical alternatives, misperceive threat, fail to reassess evolving circumstances, and resort to force, including deadly force, when such force was unnecessary or unjustified.

437. Despite this actual knowledge, the CITY consciously failed to take meaningful corrective action.

438. Among other things, the CITY failed to meaningfully discipline, retrain, monitor, restrict, reassess, or otherwise intervene with respect to STILLMAN despite accumulated warning signs and available intervention mechanisms.

439. The CITY nevertheless continued to arm, deploy, and authorize STILLMAN to engage in street-level encounters involving pursuit, seizure, and the potential use of deadly force.

440. The CITY's conduct constituted an utter indifference to and conscious disregard for the safety of others, including ADAM.

441. The precise risks known to the CITY materialized on March 29, 2021, when STILLMAN escalated a foot pursuit, failed to use available alternatives, failed to reassess evolving circumstances, and used deadly force in circumstances where deadly force was not necessary or justified.

442. As a direct and proximate result of the CITY's willful and wanton retention, supervision, monitoring, and deployment of STILLMAN, ADAM sustained conscious pain and suffering, fatal injuries and died.

443. Had the CITY meaningfully intervened, retrained, restricted, supervised, monitored, or reassessed STILLMAN in light of the known risks, the shooting of ADAM would not have occurred.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

## COUNT X
### WILLFUL AND WANTON HIRING, RETENTION, SUPERVISION, MONITORING, AND DEPLOYMENT
### Against Defendant CITY

444. Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

445. Plaintiffs bring this claim pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1 et. seq.

446. At all relevant times, Defendant CITY of Chicago owed a duty to members of the public, including ADAM, to refrain from willful and wanton conduct in the hiring, retention, supervision, monitoring, discipline, reassessment, and deployment of armed police officers.

73

447.    Willful and wanton conduct includes a course of action demonstrating an actual or deliberate intent to cause harm or, if not intentional, an utter indifference to or conscious disregard for the safety of others.

448.    Prior to March 29, 2021, the CITY had actual knowledge of facts demonstrating that Defendant STILLMAN presented a heightened and foreseeable risk of engaging in unsafe, escalating, and noncompliant conduct during field encounters involving force, pursuit, threat perception, and tactical decision-making.

449.    Specifically, the CITY knew, among other things:

   a. That STILLMAN's application materials contained inconsistencies, omissions, and corrections bearing on candor, reliability, and judgment;

   b. That STILLMAN disclosed medical, health and stress-related conditions relevant to performance under pressure and decision-making in armed police work;

   c. That STILLMAN had been involved in multiple prior use-of-force incidents resulting in supervisory review, tactical advisories, and documented concerns regarding officer-created risk;

   d. That STILLMAN had repeated body-worn-camera compliance issues undermining accountability and supervision;

   e. That STILLMAN had injury history and duty-related absences bearing on perception, reaction, coordination, and decision-making under stress; and

   f. That CPD policies, training materials, and the Consent Decree identified the precise risks implicated by those facts, including escalation during foot pursuits, failure to reassess, failure to use containment, and unnecessary uses of force.

450.    Taken together, these facts created a foreseeable and substantial risk that STILLMAN would escalate encounters, fail to use available tactical alternatives, misperceive threat, fail to reassess evolving circumstances, and resort to force, including deadly force, when such force was unnecessary or unjustified.

74

451. Despite this actual knowledge, the CITY consciously failed to take meaningful corrective action.

452. Among other things, the CITY failed to meaningfully discipline, retrain, monitor, restrict, reassess, or otherwise intervene with respect to STILLMAN despite accumulated warning signs and available intervention mechanisms.

453. The CITY nevertheless continued to arm, deploy, and authorize STILLMAN to engage in street-level encounters involving pursuit, seizure, and the potential use of deadly force.

454. The CITY's conduct constituted an utter indifference to and conscious disregard for the safety of others, including ADAM.

455. The precise risks known to the CITY materialized on March 29, 2021, when STILLMAN escalated a foot pursuit, failed to use available alternatives, failed to reassess evolving circumstances, and used deadly force in circumstances where deadly force was not necessary or justified.

456. As a direct and proximate result of the CITY's willful and wanton retention, supervision, monitoring, and deployment of STILLMAN, ADAM's heirs suffered loss of companionship and society, loss of affection, loss of guidance, loss of comfort, loss of protection, loss of attention, and loss of familial relationship, among other damages.

457. Had the CITY meaningfully intervened, retrained, restricted, supervised, monitored, or reassessed STILLMAN in light of the known risks, the shooting of ADAM would not have occurred.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

**COUNT XI**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Against Defendant STILLMAN and Defendant CITY**

458.     Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

459.     Plaintiffs bring this action pursuant to 740 ILCS 180/1 et. seq., commonly known as the Illinois Wrongful Death Act.

460.     As described above, Defendants engaged in conduct that was both extreme and outrageous.

461.     STILLMAN's shot was intentionally designed to cause severe emotional distress or Defendants knew there was a high probability their conduct would cause severe emotional distress and recklessly disregarded that probability. This conduct was intentional, willful and wanton, and showed an actual or deliberate intention to cause harm, or which, if not intentional, showed an utter indifference to, or conscious disregard for ADAM's life, safety, and well-being.

462.    Defendants intended to cause severe emotional distress or recklessly disregarded the probability that their conduct, would cause ADAM severe emotional distress.

463.    Defendants' conduct caused severe emotional distress to ADAM prior to his death.

464.    As an actual and proximate cause of the emotional distress by Defendants' extreme and outrageous conduct described above, ADAM's heirs sustained damages including, but not limited to, loss of society and companionship, loss of affection, loss of guidance, loss of comfort, loss of protection, loss of attention, and loss of familial relationship.

465.    Defendant CITY is liable to Plaintiffs under the Illinois Wrongful Death Act and pursuant to the doctrine of *Respondeat Superior*.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

**COUNT XII**
**ILLINOIS SURVIVAL STATUTE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Against Defendant STILLMAN and Defendant CITY**

466.    Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

467. Plaintiffs bring this action pursuant to 755 ILCS 5/27-6 commonly known as the Illinois Survival Statute.

468. As described above, Defendants engaged in conduct that was both extreme and outrageous.

469. STILLMAN's shot was intentionally designed to cause severe emotional distress or Defendants knew there was a high probability their conduct would cause severe emotional distress and recklessly disregarded that probability. This conduct was intentional, willful and wanton, and showed an actual or deliberate intention to cause harm, or which, if not intentional, showed an utter indifference to, or conscious disregard for ADAM's life, safety, and well-being.

470. Defendants intended to cause severe emotional distress or recklessly disregarded the probability that their conduct would cause ADAM severe emotional distress.

471. Defendants' conduct caused severe emotional distress to ADAM prior to his death.

472. As an actual and proximate cause of the emotional distress by Defendants' extreme and outrageous conduct described above ADAM sustained damages including, but not limited to, a fatal gunshot wound to the chest, extreme and excruciating pain and suffering, physical and emotional injuries, and death. ADAM would have been entitled to receive compensation from Defendants for these injuries had he survived. Further, ADAM's estate was diminished by reason of expenses that were incurred.

473. Defendant CITY is liable to Plaintiffs under the Illinois Survival Act and pursuant to the doctrine of *Respondeat Superior*.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**,

Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

**COUNT XIII**
***RESPONDEAT SUPERIOR* AS TO CITY OF CHICAGO**

474. Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

475. At all relevant times, Defendant STILLMAN was acting within the scope of his employment as an agent or employee of the CITY of Chicago.

476. Defendant CITY of Chicago, in its capacity as a principal, is liable for the actions of its agents under the doctrine of respondeat superior.

477. Should Defendant STILLMAN be found liable for the acts alleged herein, both STILLMAN and the CITY would be liable to Plaintiffs for any judgment obtained against Defendant STILLMAN.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO, Individually and as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request that judgment be entered against Defendants **CITY OF CHICAGO & ERIC STILLMAN**, individually and as agent of CITY OF CHICAGO, in a sum in excess of the jurisdictional limits, and such other additional amounts as the jury and Court

shall deem proper, as more fully set forth in this Count, costs of said suit, and for any other relief this Court finds just and appropriate.

## COUNT XIV
## INDEMNIFICATION – 745 ILCS 10/9-102
### Against Defendant CITY of Chicago

478.    Plaintiffs adopt and incorporate paragraphs 1- 335 as and for this paragraph as if fully set forth herein.

479.    At all relevant times, Defendant STILLMAN was acting within the course and scope of his employment as a Chicago Police Officer employed by Defendant CITY of Chicago.

480.    Pursuant to 745 ILCS 10/9-102, a local public entity is required to pay tort judgments or settlements for compensatory damages for which its employee is liable while acting within the scope of employment.

481.    Accordingly, Defendant CITY of Chicago is obligated to indemnify Defendant STILLMAN for any compensatory judgment or settlement entered against him in this action arising from conduct within the scope of his employment.

**WHEREFORE**, Plaintiffs, **ELIZABETH TOLEDO and MARCO TOLEDO**, **as Co-Independent Administrators of the ESTATE OF ADAM TOLEDO**, Deceased, respectfully request this Honorable Court enter the following judgment against Defendant **CITY OF CHICAGO**, on all the claims set forth above, and specifically:

a. That Defendants be required to pay Plaintiffs general compensatory damages including, but not limited to, damages for grief and emotional pain and suffering, loss of comfort, love, affection, support, protection and society, and the economic loss that ADAM's heirs have suffered and will continue to suffer as a result of ADAM's death, in sums to be ascertained at a trial of this matter, but in any event exceeding the jurisdictional limits;

80

b. That Defendants be required to pay Plaintiffs general compensatory damages for the physical and emotional pain and suffering endured by ADAM prior to his death, in sums to be ascertained at a trial of this matter, but in any event exceeding the jurisdictional limits;

c. That Defendants be required to pay Plaintiffs special damages, including but not limited to expenses, and other computable damages, in sums to be ascertained at a trial of this matter;

d. That Plaintiffs be granted such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all counts so triable.

Respectfully submitted,
**ELIZABETH & MARCO TOLEDO Individually and as Co-Independent Administrators of the Estate of ADAM TOLEDO, Deceased**

By:    s/Adeena Weiss Ortiz

**WEISSORTIZ, P.C.**
*Adeena Weiss Ortiz,* #6278679
*Citlali Mascorro,* #6345909
Attorneys for Plaintiffs
1011 East 31st Street
La Grange Park, Illinois 60526
(708) 937-9223
AWeiss@weissortizlaw.com
CMascorro@weissortizlaw.com
info@weissortizlaw.com

81